UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,　　　　　　　Case No. 09-20573

　　　　　　Plaintiff,　　　　　　　　　　　　Mark A. Goldsmith
vs.　　　　　　　　　　　　　　　　　　　　　United States District Judge

NATHANIEL SCOTT FLEMING,　　　　　　　Michael Hluchaniuk
　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge
　　　　　　Defendant.
　　　　　　　　　　　　　　　　　　　/

**REPORT AND RECOMMENDATION**
**DEFENDANT'S MOTION TO SUPPRESS (Dkt. 12)**

**I.　PROCEDURAL HISTORY**

The indictment in this matter was unsealed on March 31, 2010.  Defendant was arrested and the arraignment was held on April 7, 2010.  The present motion to suppress was filed on May 11, 2010.  (Dkt. 12).  The government filed a response to the motion on June 1, 2010.  (Dkt. 17).  An evidentiary hearing was held on June 25, 2010.  The transcript of the hearing was prepared and filed on July 30, 2010.  (Dkt. 18).  Following the preparation of the transcript the government filed a supplemental brief on August 13, 2010, (Dkt. 20) and defendant filed his supplemental brief on September 2, 2010.  (Dkt. 21).  The government's reply brief was filed on September 16, 2010. (Dkt. 23).

This matter is now ready for report and recommendation.  For the reasons set

forth below, the undersigned R**ECOMMENDS** that defendant's motion to suppress be **DENIED**.

## II.     EVIDENTIARY HEARING

The only witness to testify at the hearing was William Meyer, a police officer for the Flint Police Department for almost 20 years with the current rank of sergeant. (Tr., p. 7). During his years as a police officer, Meyer received specialized training in drug cases and had investigated such cases for a significant part of his career. (Tr., pp. 8-9). Meyer was working in an undercover capacity on December 10, 2007, and was driving near the intersection of Dort and Atherton Streets in Flint, which is an area known for drug trafficking activity and prostitution. (Tr., p. 9). At approximately 7:30 PM, Meyer drove by the intersection and observed a woman at a pay phone next to the parking lot of a gas station/convenience store, which was the specific location of prior incidents of drug dealing. (Tr., p. 10). The woman on the pay phone was close to a black car with a man inside seated in the driver's seat and Meyer was initially suspicious of possible drug trafficking or prostitution activity based, in part, on the use of the pay phone. (Tr., pp. 11-12). Meyer drove his vehicle to a location near the pay phone and parked in the parking lot of an adjacent business in an attempt to gather additional information about the activities of these two individuals. Based on his observations of the individuals and the portions of the conversations he was able to

hear, Meyer concluded the woman was "agitated" and he thought possibly the two people were trying to purchase drugs. (Tr., p. 13).

After a few minutes, the black car left the parking lot and Meyer followed. Meyer requested the assistance of a second police officer, Michael Ross, as he followed the black car. (Tr., 14). As observed by Meyer, the black car drove to a residence in the area and stopped. Meyer did not observe any contact between the two people in the car and anyone in the house. (Tr., p. 16). The car then returned to the gas station and the woman went back to the pay phone. *Id*. Meyer again stopped his vehicle a short distance away from the pay phone in an attempt to further monitor the activities of these two individuals. *Id*. Meyer heard the man in the car tell the woman at the pay phone to "tell him" that they would "meet at his house." (Tr., p. 17).

A short time later, a second car pulled into the gas station. Meyer somehow believed this second car came to meet the people in the black car. (Tr., p. 18). The second car stopped near the entrance to the convenience store at the gas station and the driver went inside. The black car moved from the area near the pay phone to the area near the entrance to the convenience store and also near the second car that had just arrived. (Tr., p. 19). The driver of the second car talked with someone inside the convenience store and then came outside and appeared to speak to the driver of the black car. The driver of the second car then got into the back seat of

the black car. (Tr., pp. 20-21).

Based on the circumstances, Meyer believed a drug deal was about to take place and pulled his vehicle into the parking area of the gas station facing the area where the two suspect vehicles were parked. Ross also pulled his vehicle into the gas station and parked in the pump area of the station. Meyer began to approach the black vehicle and he heard Ross say "he's moving." (Tr., p. 23). Immediately after Ross's statement, Meyer observed the back seat passenger of the black car make a movement that Meyer believed might have been an attempt to reach for a weapon. *Id*. Meyer went directly to the door to the back seat and told the back seat passenger to get out of the car and showed the person his police badge. *Id*. At first the individual did not respond, but eventually he got out of the car at Meyer's direction. (Tr., pp. 23-24).

After the rear seat passenger got out of the car, Meyer observed a handgun inside a holster on the floor of the back seat where the person had been seated. *Id*. Meyer placed the back seat passenger, later identified as defendant, in handcuffs and defendant stated that he had a gun. Meyer thought defendant was referring to the gun on the floor in the back seat but defendant said he was referring to a handgun located in his pocket. Meyer checked defendant's pockets and found a 32 caliber semi-automatic pistol in defendant's pocket. (Tr., p. 25).

On cross-examination, Meyer stated that if the black car would have left as

he pulled into the parking lot it would have been "free to go," but that he would have stopped the car to "further investigate" the suspected drug activity. (Tr., p. 33). Meyer further stated he had not gone to the gas station as a result of a specific complaint or tip and he acknowledged that the events had taken place in a open, public location. (Tr., pp. 34-35). Meyer also stated that the contact with the people in the black car would have been "more of a consensual approach" if it had not been for the "movement in the vehicle." (Tr., p. 36).

In describing the location of the vehicles, Meyer stated that his vehicle was facing the black car when he drove in, but there was a car length between the front of the black car and Meyer's car and Meyer believed the black car could have driven away without difficulty, given that distance. Meyer did not have any police lights on in his vehicle during these events. (Tr., pp. 22, 39-41). Other than Meyer's testimony, the other evidence admitted at the hearing was some photographs of the area where the gas station was located and a diagram of the area. (Tr., p. 6).

### III. ANALYSIS AND CONCLUSIONS

A. <u>Standing</u>

At the threshold, the government challenges defendant's "standing" to file a motion to suppress. Defendant argues that under *Brendlin v. California*, 551 U.S. 249 (2007) and *United States v. Torres-Ramos*, 536 F.3d 542 (6th Cir. 2008), a

passenger in an automobile can challenge the basis for the traffic stop of a vehicle even if they have no expectation of privacy in the vehicle stopped under *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). (Dkt. 21, pp. 1-2). In response, the government argues that defendant was not subject to a traffic stop by police in that the vehicle he was a passenger in was already stopped for reasons that had nothing to do with the conduct of the police. Therefore, according to the government, the principles of *Brendlin* have no application to this situation. (Dkt. 23, pp. 1-3).

*Brendlin* makes clear that when a police officer stops a vehicle traveling on a street or road the officer "seizes" all of the occupants of the vehicle for the duration of the traffic stop. Here, however, there was no "seizure" of the vehicle because, based on the evidence at the evidentiary hearing, it was stopped before Meyer and Ross arrived at the entrance to the convenience store/gas station where the vehicle in which defendant was a passenger was located. Further, the undersigned concludes that the question of standing is a non-issue in this case because the vehicle was not "searched" in the Fourth Amendment sense. *Katz v. United States*, 389 U.S. 347, 351 (1967) (no legitimate expectation of privacy in items in plain view). However, even if the conduct of the officers here amounted to a Fourth Amendment search, defendant has not demonstrated that he had an expectation of privacy in the car in which he was a passenger or in the firearm that was seized from the floor of the vehicle in which he was a passenger. *Minnesota v. Carter*,

525 U.S. 83, 91 (1998).

B. <u>Detention of Defendant</u>

The evidence at the evidentiary hearing indicated that, as Meyer and Ross approached the black vehicle, which defendant had entered, the officers observed defendant make a movement suggesting to the officers that defendant might have been reaching for a firearm. (Tr., p. 23). As a result, defendant was ordered from the vehicle. Although he did not respond at first, he ultimately got out of the vehicle and was placed in handcuffs. As defendant was getting out of the vehicle, Meyer observed a handgun, inside a holster, laying on the floor of the vehicle close to where defendant had been seated.[1] (Tr., pp. 22-23). Meyer seized the handgun. Defendant made a statement about having a handgun, which Meyer initially misinterpreted thinking defendant was referring to the handgun Meyer had seized in the car. Defendant clarified the situation and Meyer seized a second handgun from defendant's pocket. (Tr., p. 25).

Defendant argues that the conduct of Meyer and Ross amounted to an unlawful seizure of defendant without reasonable suspicion, contrary to the standards for such conduct first addressed in *Terry v. Ohio*, 392 U.S. 1, 30-31

---

[1] The government argues that the gun on the floor of the car was "discarded" there by defendant. (Dkt. 23, p.2). While that determination might be a logical inference given the defendant's proximity to the handgun inside the vehicle, there was no direct evidence on that point offered during the evidentiary hearing.

(1968). (Dkt. 21, pp. 2-7). While disagreeing with defendant as to when any "seizure" took place, the government acknowledges that there was a seizure and argues that it was based on a reasonable suspicion of criminal activity. (Dkt. 23, pp. 3-5).

Defendant's argument with respect to an improper *Terry* stop is premised on the claim that defendant was "seized" when Meyer and Ross stopped their vehicles in front of the convenience store/gas station and prevented the vehicle defendant was in from leaving. However, defendant's premise is factually incorrect. The evidence at the hearing established that indeed Meyer and Ross drove their respective vehicles near the location at the convenience store/gas station where the car defendant was in was located, but the evidence does not demonstrate that their vehicles blocked the ability of that vehicle to drive away. Photographic evidence was used in an attempt to show the relative location of the vehicles at the time of the event. (Tr., pp. 27-33). It was clear to the undersigned from these photographs that Ross's vehicle, which was parked next to one of the gas station pumps, was not in a position to block the black vehicle from leaving. Meyer testified that the black vehicle would have been "free to go" if it had left before the officers walked up to it. (Tr., p. 33). Meyer also testified that his vehicle was parked facing the black vehicle, but that it was "a car length" in front of the black vehicle and there "was more than enough area [there] for the vehicle to just pull right out." (Tr., pp.

22, 41). No evidence contradictory to Meyer's testimony in this regard was offered at the hearing.

In arguing that the black vehicle was "blocked" by the police vehicles, defendant attempts to come within the shadow of *United States v. See*, 574 F.3d 309 (6th Cir. 2009). In *See*, a law enforcement officer observed a vehicle parked in a remote area of the parking lot to a housing project where criminal activity had recently taken place. The officer parked his vehicle in front of the suspicious vehicle which blocked the vehicle from leaving. *Id.* at 313 ("...a reasonable person in See's position would not have felt free to leave."). The court found that blocking the vehicle constituted a *Terry* stop, which must be supported by a reasonable suspicion of criminal activity, and the court concluded that when all the circumstances were considered, they did not amount to a reasonable suspicion. The parties agreed in *See* that the *Terry* stop began when the officer parked his vehicle in front of defendant's vehicle preventing him from leaving. *Id*. at 313, n. 3. The significant difference between *See* and the present case is that the car in which defendant was located here was never "blocked in" by a police vehicle and there is no evidence to suggest a "reasonable person" in the black vehicle "would not have felt free to leave." *Id*. at 313.

That being said, the evidence at the hearing indicates there was a point in which a *Terry* type investigative detention took place. Generally, there are three

types of encounters between police officers and citizens: (1) consensual encounters in which contact is initiated by a police officer without any articulable reason and the citizen is briefly asked some questions; (2) a temporary detention or *Terry* stop, which must be based on a reasonable suspicion of criminal activity; and (3) an arrest which based on probable cause. *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000). A consensual encounter becomes a temporary detention when the police conduct would have communicated to a reasonable person that they were not at liberty to ignore the police presence and go about their business. Factors that can be considered in determining if the police conduct would send such a message include; (1) a threatening presence; (2) the display of weapons; (3) physical touching; and (4) the officer's language or tone of voice. *Kaupp v. Texas*, 538 U.S. 626, 629-30 (2003).

In the present case, the consensual encounter that Meyer at first intended became a *Terry* seizure or investigative detention when Meyer walked up to the window of the vehicle adjacent to where defendant was seated and ordered him out of the vehicle. Meyer also tapped on the window and showed his police badge. (Tr., pp. 23-24). At that point, a reasonable person in the back seat of that vehicle would not have felt free to go about their business.

Defendant, although contending the seizure took place when Meyer parked his vehicle facing the vehicle defendant was in, argues that there was no reasonable

suspicion of criminal activity to justify a *Terry* stop pointing to the sequence of events Meyer had observed. (Dkt. 21, pp. 3-6). The government contends that Meyer observed suspicious conduct on the part of the individuals he was observing and that, additionally, Meyer observed "furtive behavior" on the part of defendant. This combination of factors, according to the government, amounted to reasonable suspicion of criminal activity.

Defendant compares his situation with the facts in *See* and contends that there were fewer reasons to suspect him of criminal activity than the defendant in *See* and that case did not amount to reasonable suspicion. The factors in *See* that were ultimately found insufficient included: (1) the events took place at 4:30 AM; (2) the individuals were in a high crime area; (3) the officer was aware that robberies had recently taken place in that area; (4) there were three men in the car; (5) the car's interior light was off; (6) the car was parked in a dimly lit portion of the parking lot; and (7) the car did not have a front license plate. In ruling, the Court stated the first three factors were "context-based factors that would have pertained to anyone in the parking lot at that time and should not be given undue weight." *See*, 574 F.3d at 314. Other factors that presumably could have contributed to a reasonable suspicion of criminal conduct but did not exist in *See* were: (1) the officer was not responding to a complaint; (2) the officer did not suspect the men of a specific crime; (3) the officer had not seen the men sitting in

the car for an extended period of time; (4) the officer was not acting on a tip; (5) the officer had not seen the men do anything suspicious; and (6) the men did not try to flee upon seeing the officer approach. *Id*.

Clearly there were some "context-based" facts in the present case including that the events took place at night in a high crime rate area. However, some of the facts not present in *See* existed, to some degree, in this case. Meyer was not responding to a complaint and was not acting on a tip, but he did observe the conduct of at least two of the people involved for sufficient time to reinforce his suspicion of their involvement in criminal activity. The reasonable suspicion calculus here is reasonably based on all the individuals involved in what was suspected to be joint criminal conduct, not just the conduct of defendant. Additionally, Meyer suspected these individuals of a specific crime - drug trafficking - and it was their active conduct, rather than just "context-based" facts, which served as the basis for his suspicions. Lastly, the suspects did not try to flee when the officers approached, but defendant did make what was perceived as a "furtive" movement inside the car which obviously meant something to both Meyer and Ross.[2] Whether a reasonable suspicion exists, must be based on a

---

[2] Flight in the presence of law enforcement officers is an expression of consciousness of guilt and may create a reasonable suspicion justifying a *Terry* stop without other factors. Furtive movement arguably demonstrates the same factor although to a lesser degree. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion. [Evasive behavior] is suggestive of

consideration of the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The officer is allowed to draw on his or her own experience and specialized training "to make inferences from and deductions about the cumulative information available to [the officer] that might elude an untrained person." *Id.* Based on all of these factors, the undersigned concludes that Meyer had a reasonable suspicion of criminal activity as of the time he displayed his badge, announced his presence and directed defendant to get out of the vehicle.

A related question, not addressed by either party, is whether Meyer could have properly directed defendant to get out of the vehicle, even assuming there was a reasonable suspicion of criminal activity to justify a *Terry* stop. The "frisk" of a person subject to a lawful *Terry* stop is a separate issue from the initial "stop." "[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, — U.S. —,129 S.Ct. 781, 784 (2009). A passenger in a lawfully stopped vehicle can be asked to exit the vehicle for the purpose of conducting a pat-down search, where the police officer has a reasonable suspicion that the person subjected to the search is armed and dangerous. *Id.* at 784. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the

---

wrongdoing [and] the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 124-25.

circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

As indicated above, whether the totality of the circumstances supports the determination that reasonable suspicion exists, a court must allow the officers involved in the event to draw on their experience and training and the court should give due weight to the inferences drawn by the officers. *Arvizu*, 534 U.S. at 273. Most of the factors that related to determining if a reasonable suspicion of criminal activity existed apply to the question of whether a reasonable suspicion defendant was armed existed. The events took place in an area known for criminal activity at a specific location (the gas station/convenience store) where drug trafficking activity had previously taken place. While ambiguous conduct in a high crime area is not in itself sufficient to establish a reasonable suspicion, it is a factor that can be considered. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008). Meyer observed and overheard the man and woman in the black vehicle for a period of time and he concluded, based on almost 20 years of experience as a police officer, that they appeared to be about to engage in a drug transaction. The arrival of defendant appeared to confirm Meyer's suspicion of an impending drug transaction in that it caused him to become overt in his investigation of this suspicious conduct and to approach the individuals he had been observing. The last factor in this chain of circumstances

was the "furtive" movement undertaken by defendant as the officers approached the vehicle. This action was sufficiently objective and particularized such that Meyer could reasonably have believed that defendant was concealing a weapon. "Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions." *United States v. Caruthers*, 458 F.3d 459, 466-67 (6th Cir. 2006) ("bending or leaning," "arm movements" that could be an attempt to conceal or "unusual posture" examples of furtive conduct). Given the justified suspicion of a drug transaction, the possibility that one or more of the individuals involved would be armed was very real. *United States v. Hardin*, 248 F.3d 489, 499 (6th Cir. 2001) ("This Court has held many times that guns are tools of the trade in drug transactions."). The totality of these factors justified Meyer's belief that reasonable suspicion existed that defendant was armed and dangerous. Perhaps individually they might not have crossed the threshold, but factors that seem benign when considered separately might establish reasonable suspicion when viewed collectively. *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006).

As defendant was exiting the vehicle in response to Meyer's direction, Meyer observed a handgun on the floor of back seat area of the vehicle. At that point, the handgun was subject to seizure under the plain view doctrine. That doctrine is applicable where the item in question is plainly visible to the officer, the

officer is legally present in the place where the item can be plainly seen, and the incriminating nature of the item is immediately apparent. *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007). With respect to the last factor, a variation of the rule applies to firearms. Police may seize a firearm in plain view if the firearm poses a danger because of its inherently dangerous nature even if its illegality is not readily apparent. *United States v. Atchley*, 474 F.3d 840, 850 (6th Cir. 2007); *see also United States v. Bishop*, 338 F.3d 623, 628-29 (6th Cir. 2003). Clearly the firearm, laying on the floor of a vehicle suspected of being the site of a drug transaction, posed a danger to the officers as well as to others in the area.

No separate issue has been made of the search and seizure of the second handgun found on defendant's person during the "frisk" of him after he got out of the vehicle. It is assumed that defendant would argue that the seizure of the second handgun would be the fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471 (1963). Given the determination that the conduct of the officers in seizing and searching defendant was proper, the seizure of the second firearm was not the fruit of the poisonous tree.

## IV. RECOMMENDATION

Based on the foregoing, the undersigned **RECOMMENDS** that defendant's motion to suppress be **DENIED**.

The parties to this action may object to and seek review of this Report and

16

Report and Recommendation
Motion to Suppress
*U.S. v. Fleming*; Case No. 09-20573

Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: October 20, 2010

s/Michael Hluchaniuk
Michael Hluchaniuk
United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I certify that on October 20, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: David A. Koelzer, Attorney at Law, and Craig F. Wininger, AUSA, and I certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): Pretrial Services Agency and U.S. Marshals Service.

s/Tammy Hallwood
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov